UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------x
EDGAR TELESFORD,

          Plaintiff,

  -against-

NEW YORK CITY DEPARTMENT OF
EDUCATION, MALIK SMALL, JOYCE
STALLINGS-HARTE,

          Defendants.
------------------------------------------------------------x

NOT FOR PUBLICATION
**MEMORANDUM & ORDER**
16-CV-819 (CBA) (SMG)

**AMON, United States District Judge:**

Plaintiff Edgar Telesford brought this action against the New York City Department of Education ("DOE") and two individuals alleging, inter alia, disability-based discrimination and retaliation under the Americans with Disabilities Act ("ADA"). I previously dismissed all claims except for those brought against DOE under the ADA. (See ECF Docket Entry ("D.E.") # 57.) Presently before the Court is DOE's motion for summary judgment on the remaining ADA claims. For the reasons stated below, the motion is GRANTED.

## BACKGROUND[1]

In the summer of 2012, Edgar Telesford was hired by DOE to work as a middle-school science teacher. (D.E. # 80-1 ("Rule 56.1 Statement") ¶¶ 8, 10-11.) Telesford was hired for a probationary period of one year through a "teaching fellows" program. (Id.) He did not have his teacher's certification and was expected to work towards attaining a graduate degree in education. (Id. ¶¶ 7, 9.)

In May 2013 while substitute teaching a gym class, Telesford was accused of improperly recording a group of female students on his cell phone. (Id. ¶ 15.) DOE conducted an investigation

---

[1] Except where noted, the following facts are undisputed per the parties' Rule 56.1 Statements. (See D.E. # 80-1.)

1

into the incident,[2] which ultimately concluded that Telesford had violated a DOE regulation prohibiting the unauthorized filming of students. (Id. ¶¶ 17-23.) A disciplinary letter was issued which stated that "[c]ontinued violation of . . . Regulations can result in an adverse rating and/or lead to termination of employment." (Id. ¶ 24.) At the end of the 2012-2013 school year, the school's Principal rated Telesford "Satisfactory" and his probationary period was extended another year. (Id. ¶¶ 25-26.)

During the 2013-2014 school year, Telesford received several disciplinary letters to file. (Id. ¶ 28.) In October he received a disciplinary letter for missing the deadline to put up his bulletin board. (Id.) In December he received another letter after failing to properly take attendance. (Id. ¶¶ 29-30.) And in May he received a disciplinary letter after refusing to cover another teacher's class as directed. (Id. ¶ 31.) That letter informed Telesford that "this incident may lead to further disciplinary action including an adverse rating and your termination." (Id. ¶ 33.)

Telesford also received several negative evaluations during the 2013-2014 school year. The school's evaluation system rates teachers in various categories, each of which fall within a higher-level domain. (Id. ¶ 34.) During a February 2014 observation, Telesford was rated "Ineffective" in half of all categories. (Id. ¶ 35.) The review described Telesford's classroom activities as "poorly aligned with the instructional outcome," and "not designed to engage students in active intellectual activity." (Id. ¶ 38.) In five additional evaluations during April and May 2014, Telesford typically received "Ineffective" or "Developing" ratings in the majority of categories. (Id. ¶¶ 39, 42-43, 46, 53.) Within the domains of Instruction and Professional Development, he often did not achieve a single rating of "Effective." (Id. ¶¶ 40, 44, 47, 51.) One

---

[2] This was actually Telesford's second time being investigated that year; he had been placed on leave from October 12, 2012 through January 2, 2013 while he was investigated (and ultimately exonerated) following charges that he had given a female student suggestive looks. (Id. ¶¶ 13-14.)

evaluation reported that Telesford's teaching demonstrated a "lack of rigor." (Id. ¶ 45.) Another stated that he "has to be reminded of coverages and getting to meetings and classes on time." (Id. ¶ 48.)

On June 6, 2014, Telesford suffered a broken leg during a school field trip. (Id. ¶ 56.) He was placed in a hip-to-toe cast and spent six weeks on bedrest, followed by two months of wheelchair use and physical therapy. (Id. ¶ 56; D.E. # 80-4 ("Pl. Decl.") ¶ 11.) DOE approved seven months of injury-related leave. (Rule 56.1 Statement ¶ 57.) Telesford contends that as a result of his injury, major life activities—such as walking, running, and ascending and descending stairs—were substantially limited. (D.E. # 19 ¶ 22.) Telesford continued to walk with a cane for at least the next year,[3] and allegedly continues to suffer from arthritis. (Pl. Decl. ¶ 11.)

The Principal at Telesford's school, Malik Small, evaluated teachers for tenure at the end of the schoolyear in June. (Rule 56.1 Statement ¶ 58.) On July 8, 2014, Principal Small sent Telesford an e-mail stating that he was recommending Telesford be denied tenure. (Id. ¶ 59.) Principal Small believed that Telesford "hadn't demonstrated to improve pedagogically or professionally." (Id. ¶ 60.) The Principal's recommendation went to the Superintendent, Joyce Stallings-Harte. She reviewed the recommendation, Telesford's letters to file, and his observations, and denied his tenure in September 2014 while he was on injury leave. (Id. ¶¶ 62, 63.) The termination took effect in December 2014. (Id. ¶ 65.)

Telesford then filed complaints against the Principal and Superintendent—one with DOE's Office of Equal Opportunity, and one with the Equal Employment Opportunity Commission ("EEOC")—alleging disability-based discrimination because he was terminated while on leave.

---

[3] Telesford's October 2020 declaration states that he "continue[s] to . . . walk with a cane as a result of the injury." (Pl. Decl. ¶ 11.) In his June 2019 deposition, however, Telesford responded "Yes" when asked "Are you able to ambulate without any aids at this time?" (D.E. # 81-2 at 134.)

3

(Id. ¶ 72; Pl. Decl. ¶ 22.) Telesford also appealed the denial of tenure through his union. (Rule 56.1 Statement ¶ 66.) A DOE Chancellor's Committee considered this appeal in March 2015. (Id. ¶ 67.) The committee recommended, by a 2-1 vote, that Telesford's tenure should be reinstated. (Id. ¶ 68.)

In June 2015 Telesford received a letter from the Superintendent stating that she was reversing the initial denial of tenure. (Id. ¶ 70.) But the Superintendent sent a follow-up five days later stating to disregard her first letter—it was "sent in error"—and that the initial decision to deny Telesford tenure was in fact affirmed. (Id. ¶ 71; D.E. # 81-2 ("Ex.") at 407.) Apart from the sentence instructing Telesford to disregard the first letter as an error, the first and second letters were identical but for "reversed" being substituted by "reaffirmed." (Ex. at 405, 407.) In the days between those letters, Telesford had sent a written request for accommodations when he returned to work, such as access to an elevator and assistance with setting up the lab. (Rule 56.1 Statement ¶¶ 73-74.) The Superintendent does not recall having seen this request. (Id. ¶ 75.) In the past, Principal Small had provided similar accommodations to other teachers and staff. (Id. ¶ 76.)

## STANDARD OF REVIEW

Summary judgment is appropriate if the pleadings and evidence that would be admissible at trial show that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see Anderson v. Liberty Lobby Inc., 477 U.S. 242, 247 (1986); Major League Baseball Props., Inc. v. Salvino, Inc., 542 F.3d 290, 309 (2d Cir. 2008). The court's function is not to resolve disputed issues of fact but "to determine whether this is a genuine issue for trial." Anderson, 477 U.S. at 249.

In determining whether the moving party has met its burden, the court must "construe the facts in the light most favorable to the non-moving party. . . ." Brod v. Omya, Inc., 653 F.3d 156,

164 (2d Cir. 2011) (internal quotation marks omitted). Nevertheless, "mere speculation and conjecture is insufficient to preclude the granting of" summary judgment. Harlen Assocs. v. Inc. Vill. of Mineola, 273 F.3d 494, 499 (2d Cir. 2001) (citing Western World Ins. Co. v. Stack Oil, 922 F.2d 118, 121 (2d Cir. 1990)). Rather, the non-moving party "must 'set forth specific facts showing that there is a genuine issue for trial' . . . ." See Rubens v. Mason, 527 F.3d 252, 254 (2d Cir. 2008) (quoting Fed. R. Civ. P. 56(e)). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Anderson, 477 U.S. at 249–50 (citations omitted).

In discrimination cases, courts must be mindful that a "victim of discrimination is . . . seldom able to prove his or her claim by direct evidence and is usually constrained to rely on the cumulative weight of circumstantial evidence." Rosen v. Thornburgh, 928 F.2d 528, 533 (2d Cir. 1991). However, "[i]t is now beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases." Abdu-Brisson v. Delta Air Lines, Inc., 239 F.3d 456, 466 (2d Cir. 2001); see also Holtz v. Rockefeller & Co., Inc., 258 F.3d 62, 69 (2d Cir. 2001).

## DISCUSSION

### I. Discrimination Under the ADA

DOE first argues that Telesford has failed to establish a triable fact as to whether he was discriminated against on the basis of disability.[4] (See D.E. # 81-4 ("Def. Br.") at 10-15.) Discrimination claims under the ADA are subject to the burden-shifting analysis set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). See McBride v. BIC Consumer

---

[4] DOE also makes a general argument that Telesford is not entitled to ADA protections because he was not "disabled" under the ADA. Because I conclude that DOE is entitled to summary judgment in any event, I need not reach the question of whether a reasonable jury could find Telesford to have been "disabled" under the ADA.

5

Prods. Mfg. Co., 583 F.3d 92, 96 (2d Cir. 2009). Under that framework, a plaintiff must first establish a prima facie case of discrimination; the burden then shifts to the employer to articulate a legitimate non-discriminatory reason for the adverse employment action, which the plaintiff may rebut by showing the proffered reasons to be pretextual. McBride, 583 F.3d at 96.

## A. Telesford Has Not Established a Prima Facie Case of Discrimination.

Telesford must first establish a prima facie case that adverse employment action "was imposed because of [his] disability." Davis v. New York City Dep't of Ed., 804 F.3d 231, 235 (2d Cir. 2015). DOE argues that Telesford has not adduced evidence giving rise to this "inference of discrimination." Jacobs v. New York City Dep't of Ed., 768 F. App'x 86, 87 (2d Cir. 2019) (affirming grant of summary judgment because "stray disability-related remarks uttered by various supervisors . . . do not evince an intent to terminate [an employee] because of her disability"). Plaintiffs can establish an inference of discrimination in several ways. See Abdu–Brisson, 239 F.3d at 468. Generally they must show that their employer treated them differently than similarly qualified people without disabilities. See Camarillo v. Carrols Corp., 518 F.3d 153, 156 (2d Cir. 2008) (citing 42 U.S.C. § 12182(b)(2)(A)(iii)). For example, an employer might have terminated a disabled employee and then sought a non-disabled replacement of similar qualifications. See Roberts v. New York State Dep't of Correctional Servs., 63 F. Supp. 2d 272, 283-84 (W.D.N.Y. 1999). Or the employer could have made disparaging disability-related remarks indicative of invidious intent. See Zhang v. Barr Labs., Inc., No. 98-cv-5717, 2000 WL 565185, at *4 (S.D.N.Y. May 8, 2000).

Telesford rests his prima facie case on the temporal proximity between his injury and the adverse employment actions taken against him. Specifically, he points to (1) Principal Small recommending that he be denied tenure during his medical leave, and (2) the Superintendent

6

affirming her denial of tenure days after Telesford requested disability-related accommodations. DOE contends that temporal proximity alone is insufficient to create a prima facie case "when gradual adverse job actions began well before the plaintiff became disabled." (Def. Br. at 11 (citing Powell v. Merrick Acad. Charter Sch., No. 16-cv-5315, 2018 WL 1135551, at *21 (E.D.N.Y. Feb. 27, 2018).) DOE is correct: temporal proximity alone will not raise an inference of discrimination when gradual adverse job actions began well before the employee became disabled and incurred the adverse employment actions. See McDonnell v. Schindler Elevator Corp., No. 12-cv-4614, 2014 WL 3512772, at *5 (E.D.N.Y. July 16, 2014) ("'[N]exus of time' alone is not enough to give rise to an inference of discrimination when gradual adverse job actions began well before the plaintiff became disabled."); cf. Slattery v. Swiss Reinsurance Am. Corp., 248 F.3d 87, 95 (2d Cir. 2001) (same, for retaliation claims); Chamberlin v. Principi, 247 F. App'x 251, 254 (2d Cir. 2007).

Telesford faced gradual adverse job actions long before his injury and termination.[5] Throughout the 2013-2014 schoolyear he received numerous disciplinary letters to file: one in October, one in December, and one in May. Those letters warned that such incidents "may lead to further disciplinary action including an adverse rating and your termination." (Rule 56.1 Statement ¶ 33.) Telesford was observed six times but often did not achieve a single "Effective" rating in the domains of Instruction or Professional Development. This undisputed record evidence makes it plain that Telesford's employment was at risk long before he became injured.

Telesford contends that temporal proximity alone can establish a prima facie case, noting that I denied DOE's motion for judgment on the pleadings which challenged the sufficiency of

---

[5] Because the facts must be considered in the light most favorable to the non-movant, I do not consider the two investigations against Telesford during his first year, the 2012-2013 schoolyear. The first investigation appears to have been resolved in Telesford's favor. And the second investigation's disciplinary letter did not issue until August 6, 2014—after Telesford's injury and the recommendation that his tenure be denied. (Rule 56.1 Statement ¶ 24.)

7

temporal proximity. But while temporal proximity may suffice at the pleadings stage, see Vale v. Great Neck Water Pollution Control Dist., 80 F. Supp. 3d 426, 437 (E.D.N.Y. 2015), it does not suffice where a lengthy period of adverse actions precedes the employee's termination, see Powell, 2018 WL 1135551, at *7 (granting Rule 12 motion to dismiss ADA discrimination claim where "[t]he Complaint makes it obvious that Plaintiff was subject to disciplinary action, and that her position was demonstrably at risk, well before she disclosed her disability").

In short, Telesford has not established a prima facie case of disability discrimination because he alleges only temporal proximity, yet was subject to gradual adverse actions long before his injury and termination. Summary judgment is accordingly granted as to Telesford's discrimination claim under the ADA.

### B. Legitimate Non-discriminatory Reasons Supported Telesford's Termination.

Even if Telesford had established a prima facie case of discrimination, DOE would be entitled to summary judgment because it has proffered legitimate, non-discriminatory reasons for terminating Telesford, which no reasonable juror could find to be pretextual. According to DOE, it determined that Telesford did not warrant tenure after considering his observations and letters to file. Poor performance is unquestionably a legitimate reason for termination. See, e.g., McPherson v. New York City Dep't of Ed., 457 F.3d 211, 215 (2d Cir. 2006) (DOE legitimately terminated plaintiff who had been subject to discipline); Jacobs, 768 F. App'x at 87-88 (same).

Telesford contends that DOE's proffered reasons are pretextual. He first argues that DOE's evidence was "found insufficient by the majority of the DOE's own Chancellor's Committee to warrant Plaintiff's termination." (D.E. # 80 ("Opp'n") at 14-15.) But one inferior decisionmaker's belief that an employee should be retained does not render suspect his superior's concluding otherwise. That is especially so here, where the committee fractured 2-1

8

as to whether tenure should be reinstated, and Principal Small—who worked most closely with Telesford—recommended that his tenure be denied.

Telesford next points to the fact that the Principal had asked him during a May 2014 meeting to teach an upcoming summer course after the school year concluded. If his poor reviews and disciplinary letters had actually put his employment at risk, the argument goes, then Telesford would not have been offered this opportunity. But Telesford's one-year appointment was through November 22, 2014. (See Rule 56.1 Statement ¶ 26.) That the school expected him to work over the summer within his appointment period is no reason to believe that it intended to grant him tenure. Indeed, his formal tenure review had not yet occurred when this request was made in May. (See id. ¶ 58; Ex. at 190.) At most, the request to teach a summer course indicates that Telesford's performance did not merit immediate termination.

Along similar lines, Telesford claims that during this May meeting, "Principal Small and Telesford verbally agreed that Telesford would be returning to his teaching position" the following year. (Opp'n at 15.) He also alleges that "Principal Small stated that he was removing the letters that were in Telesford's personnel file, going so far as [to] physically place them in the paper shredder in front of me, indicating that I was going to be moving forward with a 'clean slate.'" (Id.) But these alleged promises were raised for the first time in a declaration submitted by Telesford in opposition to summary judgment. And a plaintiff cannot defeat summary judgment by raising facts in such a declaration which contradict his deposition testimony. See Hayes v. New York City Dep't of Corrections, 84 F.3d 614, 619 (2d Cir. 1996); Buttry v. General Signal Corp., 68 F.3d 1388, 1493 (2d Cir. 1995) ("[I]t is well settled in this circuit that a party's affidavit which contradicts his own prior deposition testimony should be disregarded on a motion for summary judgment." (quotations and citation omitted)); see also Cleveland v. Policy

9

Mgmt. Sys Corp., 526 U.S. 795, 806 (1999) ("[A] party cannot create a genuine issue of fact sufficient to survive summary judgment simply by contradicting his or her own previous sworn statement . . . without explaining the contradiction or attempting to resolve the disparity.").

These newly-raised facts—for which Telesford provides no citation, (see Pl. Decl. ¶ 9)— contradict Telesford's deposition testimony and are therefore disregarded. Telesford did not mention these facts during his deposition, despite being given the opportunity to do so:

> Q. Did you believe that Mr. Small had discriminated against you based upon your injury?
>
> A. Well, yes.
>
> Q. Why did you believe that?
>
> A. Mr. Small had invited me to come back to teach an SAT class, a specialized high school test for the students. So I wasn't injured at that time. That was in May. Around May 27th or 28th to May 30th. He said I wanted you to run that because I was doing it for the student -- for the 8th graders. So he wanted to have a prep course. So I wasn't injured then.
>
> Q. Would that have been a course that you taught over the summer?
>
> A. Yes, sir.
>
> Q. Did he invite you to do this in person, via letter, something else?
>
> A. In person.
>
> Q. Aside from that, was there any other reason why you felt that he was discriminating against you for your injury?
>
> A. The fact that he had not signed the LODI forms. They had not been submitted. It was held up.

(Ex. at 126-27.[6]) Telesford never explained why these facts were not disclosed in his deposition, nor did he amend his deposition testimony as is allowed under the Federal Rules. See Fed. R. Civ. P. 30(e)(1). Having been given a clear opportunity to disclose these alleged promises during his deposition, Telesford cannot do so for the first time in his declaration opposing summary judgment. Hayes, 84 F.3d at 619; see Patacca v. CSC Holdings, LLC, No. 16-cv-679, 2019 WL 1676001, at *10 (E.D.N.Y. Apr. 17, 2019) (rejecting reliance on post-deposition declaration to thwart summary judgment where plaintiff had opportunity to raise issue in earlier deposition, but did not); Ciliberti v. Int'l Bhd. of Elec. Workers Local 3, No. 08-cv-4262, 2012 WL 2861003, at *11 (E.D.N.Y. July 10, 2012) (rejecting plaintiff's attempt to create disputed issues of fact via affidavit, when the purported facts contradicted his prior deposition testimony).

Although Telesford's declaration cites no evidence for these new facts, in briefing and at oral argument, Telesford's counsel cited the following testimony of Principal Small in an attempt to corroborate the alleged verbal agreement between Principal Small and Telesford:

> Q. Was [Telesford] scheduled to be the science teacher for the 2014/2015 school year at the time he was injured?
>
> A. Yes.
>
> . . .
>
> Q. Now, you previously indicated that when you gave him his rating, he had a position at your school for the following school year, the 2014/2015 school year; is that correct?
>
> A. Correct.

---

[6] Similarly, at the hearing regarding his tenure-denial appeal, Telesford stated that Principal Small "tried to recruit him for a summer school assignment" but apparently said nothing about any verbal agreement to return the following year. (Ex. at 366.)

11

(Ex. at 189-90 (cited in Opp'n at 13 and during oral argument).) This testimony does not support the position that a final decision had been made that Telesford would be returning the following year. Viewed in the context of the whole record evidence—including Principal Small's testimony that immediately followed—it is plain that any statements made in May 2014 were pending Telesford's formal tenure review, which would not occur until the end of June:

> Q. At some point did you determine that you were going to deny Mr. Telesford tenure?
>
> A. Yes.
>
> Q. Do you recall when that was?
>
> A. It would have been after the last day off [sic] school which is typically June 26th and then myself and my [Assistant Principal] will go into deliberations around planning for the following school year.

(Ex. at 190.) Indeed, Telesford admits that Principal Small did not recommend his tenure be denied until July, with the Superintendent then denying it in September. (Rule 56.1 Statement ¶¶ 59, 63.) Any conversation with Principal Small in May would have reflected, at most, a wholly preliminary statement by an inferior decisionmaker. (See id. ¶¶ 62-63.) Such statements from Principal Small would not have been fully informed, as it was the Assistant Principal who had conducted many of Telesford's observations. (Id. ¶¶ 35, 46, 49.) Moreover, the extension-of-probation agreement, signed by Telesford and the Superintendent the year prior, could "only be modified by a written stipulation executed by both parties." (Ex. at 222 (emphasis added).) In sum, even if the "verbal agreement" raised for the first time in Telesford's declaration were not disregarded, it is "not significantly probative" enough to preclude summary judgment. Anderson, 477 U.S. at 249-50; cf. Shabat v. Blue Cross Blue Shield, 925 F. Supp. 977, 988 (W.D.N.Y. 1996) ("[P]rior good evaluations alone cannot establish that later unsatisfactory

12

evaluations are pretextual." (internal quotation marks omitted)). Telesford may have mistakenly believed that an oral remark opted him out of the tenure review process and obviated the agreement he expressly signed; but such a mistaken belief is not evidence that DOE's reasons for terminating Telesford were pretextual.

In sum, DOE is additionally entitled to summary judgment on Telesford's ADA discrimination claim because it has proffered legitimate, non-discriminatory reasons for terminating Telesford which no reasonable juror could conclude are pretextual.

## II. Retaliation Under the ADA

Telesford claims that when the Superintendent reaffirmed her previous decision to deny him tenure (rejecting the appeals committee's 2-1 recommendation to reinstate tenure), she did so in retaliation for Telesford having filed discrimination complaints internally and with the EEOC. Retaliation claims under the ADA are evaluated using the McDonnell-Douglas burden-shifting framework. To establish a prima facie case of retaliation, a plaintiff must show that "(1) he engaged in an activity protected by the ADA; (2) the employer was aware of this activity; (3) the employer took adverse employment action against him; and (4) a causal connection exists between the alleged adverse action and the protected activity." Treglia v. Town of Manlius, 313 F.3d 713, 719 (2d Cir. 2002). The burden then shifts to the employer to articulate legitimate non-retaliatory reasons for the adverse employment action, which the employee may then attempt to demonstrate are pretextual. See id.

### A. Telesford Has Not Established a Prima Facie Case of Retaliation.

Telesford again rests his prima facie case for retaliation on temporal proximity—here, the proximity between his discrimination complaints and his termination. (See Opp'n at 19-21.) DOE again argues that temporal proximity alone is insufficient when the employee was already

13

subject to gradual adverse job actions. Telesford does not address this argument. (See generally Opp'n.)

The Second Circuit has plainly stated, in a case cited throughout DOE's opening brief, that "[w]here timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise." Slattery, 248 F.3d at 95; see Blodgett v. 22 South Street Operations, LLC, 828 F. App'x 1, 4 (2d Cir. 2020); Kastrati v. Progress of Peoples Mgmt. Corp., No. 18-cv-6731, 2020 WL 6940991, at *5 (E.D.N.Y. Nov. 24, 2020) ("Plaintiff's allegations purportedly supporting an inference of retaliatory intent rest exclusively on timing. However, Plaintiff was subject to gradual adverse actions well before he ever requested FMLA leave. . . .").

Telesford cites a handful of cases discussing temporal proximity, but each is distinguishable. Reed v. A.W. Lawrence & Co., Inc., 95 F.3d 1170 (2d Cir. 1996) and Cifra v. General Electric Co. 252 F.3d 205 (2d Cir. 2001) did rely on temporal proximity for a prima facie case of retaliation. But the courts in those cases did not confront the Slattery rule requiring more when the protected activity followed gradual adverse employment actions.[7] Clark County School Dist. v. Breeden is even further afield. 532 U.S. 268 (2001). Breeden recognized that certain cases "accept mere temporal proximity . . . as sufficient evidence of causality to establish a prima facie case" where the proximity is "very close." Id. at 273. But Breeden did not hold that temporal proximity will always suffice; and the Court's explanation that temporal proximity must be "very close" underscores the case-by-case nature of the analysis. Telesford lastly cites a handful of cases for the uncontroversial proposition that "the Second Circuit has not drawn a

---

[7] Reed is also outdated, having been decided years before Slattery. Although the opinion in Cifra issued after Slattery (by a month), it was briefed and argued well before Slattery was decided. A Second Circuit panel subsequently discussed Cifra and Slattery together and reaffirmed the rule of Slattery. See Nicastro v. New York City Dep't of Design and Construction, 125 F. App'x 357, 358 (2d Cir. 2005).

14

bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship . . . ." (Opp'n at 20.) But it is not the tenuousness of temporal proximity that undermines Telesford's claim; it is the absence of any other evidence that would support an inference of retaliation.

### B. Legitimate Non-Retaliatory Reasons Support Telesford's Termination.

Even if Telesford had established a prima facie case of retaliation, DOE would be entitled to summary judgment on this claim because it has proffered legitimate non-retaliatory reasons for terminating Telesford, which no reasonable juror could conclude are pretextual. Specifically, DOE contends that it terminated Telesford due to his poor reviews, lack of pedagogical or professional progress, and disciplinary letters to file. Telesford does not dispute that those reasons are legitimate but instead attempts to demonstrate that they are pretextual. As with the prima facie case, Telesford cannot rely on temporal proximity alone to establish pretext. See El Sayed v. Hilton Hotels Corp., 627 F.3d 931, 933 (2d Cir. 2010) (affirming grant of summary judgment where the plaintiff "produced no evidence other than temporal proximity in support of his charge that the proffered reason for his discharge was pretextual").

To demonstrate pretext, Telesford points to the Superintendent having sent him a letter reversing her initial denial of tenure, only to send a letter days later affirming the denial of tenure after he requested disability-related accommodations. DOE explains, however, that the first letter was an administrative error which the Superintendent promptly corrected. (Def. Br. at 6-7.) DOE points to substantial record evidence supporting its claim of administrative error. Superintendent Stallings-Harte testified that the first letter was sent in error:

> A: I looked at it, signed it, and read "denial completion of probation," so, it was sent in error. It wasn't the correct letter.
>
> . . .

> Q: When did you realize that you sent this letter in error?
>
> A: When [the secretary] Ms. Martinez-Madi came into my office in tears telling me that the wrong letter was sent. So, that was a few days after.

(Ex. at 338.) Her secretary also testified that the first letter was an administrative error:

> Q: And do you recall having made an error on the first letter?
>
> A: Well, she [the superintendent] told me to do a discontinuance. I did this one. Maybe I might have picked up, you know, the wrong form – the wrong letter. I gave it to her to look, she signed it. . . .
>
> [A] few days later – I don't know if she picked it up or if I picked it up, that it was the wrong letter that was typed up. And then she said we got to correct it right away, so we sent the second letter.

(Id. at 386-7.) The follow-up stated expressly that the first letter "was sent in error." (Id. at 407.)

Telesford disputes that the initial letter was sent in error. And if the original letter was not sent in error, he says, a reasonable juror could find that the subsequent denial of tenure was motivated by his intervening request for accommodations.[8] The problem for Telesford is that he points to no evidence supporting his version of the facts. Telesford does cite testimony suggesting that the Superintendent and her secretary had never made such an error or overruled the appeals committee before. (Opp'n at 22-23.) In the face of the overwhelming record evidence offered by DOE, it does not suffice to speculate that because they had not made an error before, they are lying about having done so here.[9] See Shannon v. New York City Transit

---

[8] One might ask: if Telesford contends that the first letter was not sent in error, in what sense did DOE retaliate against him for his internal and EEOC complaints which were filed months earlier? Telesford attempts to fill this gap in his theory by positing that his "accommodation request made Superintendent Stallings-Harte recall his pending discrimination complaints with the OEO and EEOC." (Opp'n at 22.)

[9] In fact, the Superintendent testified that she "can't recall" whether she had ever overruled the appeals committee— not that she had never done so. (Ex. at 342:7-15.) The question of whether the Superintendent had ever overruled the appeals committee carries only minimal relevance in any event. The relevant question is whether she had ever overruled the committee when it recommended, by a 2-1 vote, to overturn her decision to terminate an employee.

16

Auth., 332 F.3d 95, 99 (2d Cir. 2003) ("Conclusory allegations, conjecture, and speculation . . . are insufficient to create a genuine issue of fact." (alteration in original)). And courts routinely excuse actions which might appear retaliatory but are shown through record evidence to have been only administrative error. See, e.g., Alexidor v. Donahoe, No. 11-cv-9113, 2017 WL 880879, at *6 n.9 (S.D.N.Y. Mar. 2, 2017); Plourde v. Snow, No. 2-cv-5532, 2006 WL 4510754, at *12 (E.D.N.Y. June 14, 2006) (concluding that plaintiff had failed to establish employer's explanation of administrative error was pretextual), aff'd sub nom. Plourde v. Paulson, 236 F. App'x 656 (2d Cir. 2007).

At oral argument, Telesford proffered two additional reasons to doubt DOE's claim of administrative error: (1) the secretary testified that she did not know whether the error had been hers or the Superintendent's, (see Ex. at 387:24-388:2), and (2) the Superintendent reviewed each letter before signing it, (see id. at 384:12-16). Courts normally will not entertain claims raised for the first time at oral argument. See United States v. Barnes, 158 F.3d 662, 672 (2d Cir. 1998). In any event, these facts do not move the needle. That the secretary could not recall specifically who made the administrative error is not evidence of pretext; it reflects only that her deposition occurred nearly five years after these events, and that memory fades over time.

As to the Superintendent having reviewed letters before signing them, the secretary explained that the initial letter "looks like it's a discontinuance[10] because it says denial of certification of completion of probation." (Ex. at 382:20-22.) The Superintendent likewise testified that she signed the letter after having "read 'denial of completion of probation.'" (Id. at 338:2-6.) In other words, the Superintendent saw "Denial of Certification of Completion of

---

[10] A "discontinuance" refers to a decision or communication discontinuing a teacher's continued employment—i.e., declining to grant tenure or extend probation. (See Rule 56.1 Statement ¶¶ 69-71.)

Probation" but not "reversed" earlier in the sentence. (Ex. at 405.) That explanation makes sense given the substantial volume of such letters the Superintendent sent in her position. (Ex. at 382:8-10 ("[T]he superintendent had a lot of discontinuance letters, a lot."); 307:22-308:13 (Superintendent testifying that she supervised thirty-five schools); see also id. at 190 (Principal Small testifying that "[w]e do a lot of staffing every year").) The testimony which Telesford cites does not support the position that the Superintendent had read this letter closely before signing it or agreed with its contents; rather, the record as a whole confirms DOE's position that the first letter was sent in administrative error.

In sum, Telesford has identified nothing in his briefing or at oral argument which could permit a reasonable juror to conclude that DOE's non-retaliatory reasons for terminating him were pretextual. DOE is accordingly entitled to summary judgment on Telesford's retaliation claim under the ADA.

### III. DOE is Entitled to Summary Judgment on Telesford's Failure to Accommodate Claim.

Telesford lastly alleges that DOE failed to accommodate his disability in violation of the ADA. Under the ADA, an employer must honor a disabled employee's request for reasonable accommodations which allow an employee to do his work despite having a disability. When an employer knows that an employee is disabled, the employer must "engage in the . . . interactive process" of working with the employee "to assess whether [the] employee's disability can be reasonably accommodated." Brady v. Wal-Mart Stores, Inc., 531 F.3d 127, 135–36 (2d Cir. 2008) (quoting Jackan v. N.Y. State Dep't of Labor, 205 F.3d 562, 566 (2d Cir. 2000)). But the ADA does not require employers to provide accommodations, or to engage in any interactive process, after an employee has been terminated. See Robles v. Medisys Health Network, Inc., No. 19-cv-6651, 2020 WL 3403191, at *12 (E.D.N.Y. June 19, 2020) (dismissing

18

accommodations claim when "the [employer] had already terminated [the plaintiff] when he attempted to engage in the interactive process").

Telesford does not dispute that terminated employees are owed no accommodations or interactive process. But he says that this principle does not apply here because he was not terminated when he requested accommodations. (See Opp'n at 24.) As discussed, this purported factual dispute has no merit. The suggestion that the first letter sent to Telesford in June 2015 was anything other than administrative error is pure speculation. When Telesford made his accommodations request, the Superintendent had already decided to affirm the initial denial of tenure. The entirety of the record evidence shows that DOE was in the process of terminating Telesford when he submitted his accommodations request—a process which began nearly a year earlier, when Principal Small recommended his tenure be denied.

No reasonable juror could conclude that DOE failed to accommodate any disability based on this accommodation request which came after Telesford had been terminated.[11] Accordingly DOE is entitled to summary judgment on Telesford's claim of failure to accommodate.

## CONCLUSION

For these reasons, DOE's motion for summary judgment is granted. The Clerk of Court is directed to enter judgment accordingly and close the case.

SO ORDERED.

Dated: January 6, 2021
      Brooklyn, New York                                                         /s/ Carol Bagley Amon
                                                                                      Carol Bagley Amon
                                                                                      United States District Judge

---

[11] That is especially so given DOE's apparent willingness to accommodate disabled employees. When Telesford was first injured he was granted seven months' leave. And he concedes that Principal Small "had implemented similar accommodations [to those he requested] previously." (Opp'n at 24.) Telesford's accommodations request would have given DOE no reason to deny his tenure, as granting such requests was easy to do and routinely done.

19